2003-NMCA-066

68 P.3d 936

**John MONTANO, Plaintiff–Appellant,**

v.

**ALLSTATE INDEMNITY COMPANY, Defendant–Appellee.**

No. 22,614.

Court of Appeals of New Mexico.

Jan. 27, 2003.

Certiorari Granted, No. 27,966, April 7, 2003.

Randi McGinn, Clay Campbell, McGinn & Carpenter, P.A., Albuquerque, NM, for Appellant.

Lisa Mann, Jennifer A. Noya, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for Appellee.

## OPINION

SUTIN, Judge.

{1} This appeal requires us to delve further into the elusive issue of whether an insured who purchases uninsured motorist coverage receives what he or she pays for. Plaintiff John Montano purchased an Allstate Indemnity Company (Allstate) multi-vehicle policy under which Montano insured four vehicles. Montano paid one premium amount for uninsured motorist bodily injury coverage. Allstate limited Montano's stacking rights to "two, but no more than two," coverage limits. Montano sued Allstate for uninsured motorist bodily injury coverage limits based on stacking of four coverage limits. The parties presented the stacking issue to the district court through cross-motions for summary judgment. The district court denied Montano's motion and granted Allstate's. Montano appeals. We affirm.

{2} The primary issue Montano attempts to resolve in this case is whether the premium charged for uninsured motorist bodily injury coverage in Allstate's multi-vehicle policy is an actuarial subterfuge that circumvents the law of, and policy favoring, stacking, and that deprives Montano of benefits he

paid for. We also look at whether the policy unambiguously limits stacking. We conclude that our cases do not require a court examination into Allstate's cost/profit actuarial analyses. Furthermore, even were we to engage in that examination, because of the manner in which this case was presented below and its procedural posture on appeal, Montano is foreclosed from arguing on appeal that Allstate considered such information as loss severity and stacking losses in setting the premium. We hold, therefore, that, under controlling New Mexico Supreme Court precedent, Allstate's stacking liability limitation is valid. We decline Montano's request that we determine, as a matter of policy, that stacking should be required no matter what the insurance policy states and irrespective of the number or amount of premiums charged. On that issue we are also constrained by decisions of our Supreme Court.

**BACKGROUND**

{3} We refer in this opinion to Allstate *Insurance* Company as "Allstate Insurance." We refer to Defendant Allstate *Indemnity* Company as "Allstate."

**A. The Procedural Posture of This Case on Appeal and Standard of Review**

■ {4} The procedural posture of this case as it arrived in this Court is important. Below, each party disputed several of the other's undisputed facts. On appeal Montano asserts contentions that, for reversal, require a resolution in his favor of certain disputed material facts. These disputed facts include, for instance, Montano's actuarial expert's reading of Allstate documents. Yet there was an understanding between the parties and the district court that the issues would be decided by the district court on cross-motions for summary judgment.

{5} The district court entered an order stating that the stacking issue was to be presented "on stipulated facts by the parties, affidavits and sworn deposition testimony." Montano did not oppose this manner of proceeding. In the summary judgment proceeding, Montano left it to the court "to ascertain and determine the facts" from the affidavits,

motions, and briefs. In oral argument on the cross-motions, Montano did not argue that issues of material fact precluded summary judgment in favor of Allstate. He argued only legal issues.

{6} On appeal, Montano does not seek reversal on the ground that genuine issues of material fact exist. Montano confirms in his brief in chief that the parties agreed to present the stacking issue to the district court for decision through cross-motions for summary judgment. In oral argument on appeal, when questioned about whether facts were in dispute requiring adjudication, Montano's counsel indicated that Montano wanted the issues decided as though all material facts were undisputed.

{7} We, therefore, review the summary judgment de novo. *Barncastle v. Am. Nat'l Prop. & Cas. Cos.*, 2000–NMCA–095, ¶ 5, 129 N.M. 672, 11 P.3d 1234. We have stated that, where the parties agree to have the district court decide an issue on cross-motions for summary judgment without raising issues of fact, on the basis of attorney representations of what the facts are, or as a matter of law on stipulated facts, we will review the case on the same basis as it was presented below. *See id.* (stipulated facts); *Barnae v. Barnae*, 1997–NMCA–077, ¶ 14, 123 N.M. 583, 943 P.2d 1036 (attorney representations); *Gonzales v. Pub. Employees Ret. Bd.*, 114 N.M. 420, 422, 839 P.2d 630, 632 (Ct.App.1992) (agreement that facts not in dispute); *see also Ontiveros Insulation Co. v. Sanchez*, 2000–NMCA–051, ¶¶ 8, 9, 129 N.M. 200, 3 P.3d 695 (distinguishing the standard of review applicable to judgments "on the merits" as opposed to "summary judgment" in case decided on cross-motions for summary judgment). We note that neither party complied with Rule 12–213(A)(4) and (B) NMRA 2002, which required that they state the applicable standard of review in their respective briefs.

**B. Historical Pricing and Stacking**

**(1) In General**

{8} In 1988 our Supreme Court ruled that an insurer must stack limits on each insured vehicle for which a separate premium for

uninsured motorist coverage is charged despite the existence in the policy of an otherwise enforceable, unambiguous anti-stacking exclusionary clause. *Jimenez v. Found. Reserve Ins. Co.*, 107 N.M. 322, 324, 757 P.2d 792, 794 (1988).

{9} Allstate Insurance immediately reacted to this decision. *See, e.g., Allstate Ins. Co. v. Indep. Appliance & Refrigeration Serv., Inc.*, 278 F.3d 1102, 1104 (10th Cir. 2002) ("In 1990, Allstate decided to end the practice of 'stacking' .... Allstate amended the policy in 1997 ... to allow stacking of two 'but no more than two' coverages."); *Allstate Ins. Co. v. Stone*, 116 N.M. 464, 465, 863 P.2d 1085, 1086 (1993) ("Until April 1990, Allstate [Insurance] had charged separate premiums.... After April 1990, however, Allstate charged one premium ... on their multi-car policy.").

{10} Before November 1989, Allstate Insurance and apparently also Allstate charged a separate premium for uninsured motorist coverage for each vehicle insured. Allstate charged $23.20 for the first vehicle, $42.40 for two vehicles, $59.40 for three, and $74.40 for four vehicles. These separate premiums included both bodily injury and property damage coverages for each vehicle. The uninsured motorist bodily injury premiums discussed throughout this opinion are for limits of $25,000 per person/$50,000 per accident.

{11} Montano represents, and Allstate does not contest, that Allstate was formed in about 1989 to insure higher risk drivers in New Mexico. After November 1989, Allstate Insurance and Allstate discontinued including both bodily injury and property damage coverages within one premium amount. In addition, Allstate Insurance and Allstate did not set out separate premiums for bodily injury coverage in a multi-vehicle policy. In regard to bodily injury coverage, Allstate began charging a premium of $34.20 for a single-vehicle policy and a premium of $63.30 for a multi-vehicle (two to four vehicles) policy. In regard to property damage coverage, Allstate charged a separate premium of $4.50 per vehicle. Allstate's actuarial data and analyses, two-tiered premium structure, and anti-stacking clauses were essentially the same as those made and employed by Allstate Insurance after *Jimenez*, 107 N.M. at 324, 757 P.2d at 794. In 1995 Allstate charged a premium for bodily injury coverage of $51 for a single-vehicle policy and a premium of $94.40 for a multi-vehicle policy.

{12} In 1997 Allstate determined it would permit stacking of "two, but no more than two," uninsured motorist bodily injury liability limits. Allstate asserts that this decision was made "because case law in other jurisdictions had found that, given Allstate's premium structure, the insurer must stack two, but no more than two, policy limits, because two, but no more than two, premiums are being charged." *See Estate of Swartz v. Metro. Prop. & Cas. Co.*, 949 S.W.2d 72, 76–78 (Ky.Ct.App.1997) (requiring stacking of limits of two, but not more than two, vehicles under a policy ostensibly charging a single premium but in fact charging $6 for a single-vehicle policy and $10 for a multi-vehicle policy, and therefore charging two separate premiums "under the guise of one lump sum"); *Wilson v. Allstate Ins. Co.*, 912 P.2d 345, 348 (Okla.1996) (requiring stacking of limits of two vehicles where, under two-tiered premium structure, the multi-vehicle premium was almost twice the one-vehicle premium, and stating that in such a circumstance the inclusion of more than two vehicles in a policy "would have no effect upon the number of [uninsured motorist] benefit amounts recoverable"); *Kramer v. Allstate Ins. Co.*, 909 P.2d 128, 129 (Okla.Ct.App.1994) (mem.) (requiring stacking of limits of two insured vehicles, but not the third, where by "charging nearly twice as much for [uninsured motorist] coverage on multiple-vehicle policies as it did for single-vehicle policies, Allstate created the reasonable contractual expectation that the amount of [uninsured motorist] coverage on a multiple-vehicle policy would be correspondingly greater than the amount of coverage on a single-vehicle policy"; and holding that as to the third vehicle, "no additional premium was charged or paid").

{13} In accordance with its policy amendment allowing stacking of two bodily injury coverage limits, Allstate in 1997 began charging a premium of $61.80 for a single-vehicle policy and a premium of $114.30 for a multi-

vehicle policy. According to Allstate, this multi-vehicle policy premium applied "whether [an insured] insured two vehicles, four vehicles ... or twenty vehicles."

### (2) Montano's Policy

{14} Montano became a named insured in November 1996 on his former wife's May 1996 Allstate policy. Allstate's 1996 standard policy form and an accompanying amendatory endorsement contained clauses limiting Allstate's liability to the amount set out in the declarations. Allstate intended by these 1996 policy clauses to preclude *any* stacking in accordance with its anti-stacking insurance policy instituted in 1989.

{15} Montano's 1996 policy was renewed effective November 9, 1997. This renewal policy was in force at the time of Montano's accident. We refer to this renewal policy as "the policy." The policy charged Allstate's multi-vehicle premium of $114.30 under Allstate's post-November 1989 single-vehicle/multi-vehicle pricing structure. The policy also contained language implementing Allstate's new stacking decision allowing the stacking of "two, but no more than two," coverage limits.

### C. The Policy Coverages and Premiums

{16} The pricing provisions of the policy with designations of the corresponding coverages are contained in the declarations pages, which are the first six pages of the policy. Page one of the policy's declarations lists the "total premium" for six months to be:

| | |
|---|---|
| Premium for 97 Ford Expedition | $ 748.70 |
| Premium for 97 Mercedes–Benz | $ 997.00 |
| Premium for 88 Cadillac | $ 596.00 |
| Premium for 91 Dodge Caravan | $ 569.00 |
| Premium for Additional Coverages | $ 114.30 |
| TOTAL | $ 3,025.00 |

The next four pages of the policy's declarations separately itemize each of the four vehicle's specific coverages, coverage limits, and premiums. For example, page two sets out coverages for the 1997 Ford Expedition, and shows the "total premium" for this vehicle to be $748.70, which is the same amount shown for that vehicle on page one. This $748.70 premium is comprised of separate premiums for liability (bodily injury and property damage), automobile medical payments, auto collision insurance, auto comprehensive insurance, and uninsured motorist insurance for property damage coverages. This page two also shows, for example, $100,000/$300,000 limits of liability for the bodily injury liability insurance coverage on the 1997 Ford Expedition. Likewise, pages three, four, and five separately itemize the same coverages and limits, and separately state the specific premiums, for the 1997 Mercedes–Benz, the 1988 Cadillac, and the 1991 Dodge Caravan.

{17} These pages, two through five, also separately set out an uninsured motorist property damage coverage premium for each vehicle: the premium for the 1997 Ford Expedition is $7.70 and $6.00 is separately charged for each of the other three vehicles, totaling $25.70. Further, each of these four pages states a "multiple car" premium discount for the specific vehicle.

{18} Uninsured motorist bodily injury coverage is not mentioned on the four declarations pages that itemize the individual premiums and coverages for each of the four insured vehicles. The final declarations page sets out one coverage and premium: "Uninsured Motorists Insurance for Bodily Injury," which appears by itself under "Additional Coverage," with a premium of $114.30, corresponding with "Premium for Additional Coverages" and "$114.30" shown on page one of the declarations. No vehicles are listed on the final declarations page.

{19} Thus, in the policy's declarations pages, the uninsured motorist bodily injury coverage and premium are nowhere separately tied to a particular vehicle, whereas the liability, medical, collision, comprehensive, and uninsured motorist property damage coverages are separately tied to individual vehicles.

### D. The $114.30 Multi–Vehicle Premium

{20} Allstate's evidence regarding the $114.30 multi-vehicle premium was contained in an affidavit of an Allstate senior actuarial

assistant, Steven Zielke. Explaining Allstate's premium structure, which we sometimes refer to as a "two-tiered" structure in this opinion, Zielke stated that "[t]he higher premium [of $114.30] charged for ... a multiple car policy [was] based solely on the increase in loss frequency caused by the fact that more than one vehicle is in use in a multi-car household," and that "[n]o portion of the higher premium ... [was] designed to account for the increased loss exposure, known as loss *severity*, caused by the increased total limits that would result if stacking of [that] coverage was allowed." Thus, according to Allstate, "the difference in rates between the single ... premium [$61.80] for one-car policies, and the single premium [$114.30] for multi-car policies with the same limits, reflects solely the difference in expected claim frequency between policies covering one car and those covering multiple cars." Allstate further asserts, based on Zielke's affidavit, that "no portion of [its] premium charge [was] for the increased loss severity which stacking would cause."

{21} Zielke's affidavit also stated:

> The prices set forth [$61.80 and $114.30] were based on the assumption that stacking of limits for two or more than two vehicles would not be allowed. This review demonstrated that, even without stacking, insured losses per policy under multi-car policies would be expected to be substantially greater than those under single car policies, due solely to the greater claim *frequency* of multi-car policies. Accordingly, it was determined that the single-car premium [$61.80] was necessary to cover expected average [uninsured motorist] Bodily Injury coverage losses with respect to single-car policies, and associated expenses and profits. It was further determined that the additional losses to be anticipated under multi-car policies because of the higher claim frequencies experienced under such policies called for a rate for multiple-car policies approximately 1.85 times higher than that for single-car policies, even when stacking of any vehicles under the multi-car policies was excluded. The premiums ... were based on those determinations, and were filed

with the New Mexico Insurance Commissioner on August 22, 1996 and approved on January 15, 1997, and were placed into effect for Allstate's New Mexico renewal policies processed February 10, 1997 and effective March 10, 1997.

Allstate further explains loss frequency as "households with multiple cars on average tend to have more accidents with uninsured ... motorists than households with only one car, so multiple-car premiums must be higher to reflect the greater loss exposure Allstate is likely to suffer when it provides [uninsured motorist] bodily injury coverage to multiple-car families." *See Sanders v. St. Paul Mercury Ins. Co.*, 148 Vt. 496, 536 A.2d 914, 919–20 (1987) (recognizing that additional risks assumed by insurer when insuring additional vehicles in the same household can justify increasing the premium without considering stacking).

### E. The Policy's Stacking Provisions

{22} In the policy's standard form AIU130, the table of contents divides the policy into four parts. Part III is designated "Uninsured Motorists Insurance Coverage SS," and contains a thirteen-subpart breakdown, one of which is "Limits of Liability." This "Limits of Liability" subpart, in pertinent part reads:

> The uninsured motorists limit stated on the declarations is the maximum amount payable for this coverage by this policy for any one accident. This means the insuring of more than one auto for other coverages afforded by this policy will not increase **our** limits of liability beyond the amount shown on the declarations.

> Regardless of the number of insured autos under this coverage, the specific limits shown on the declarations is the maximum **we** will pay under this policy[.]

Part III was amended by Amendatory Endorsement AIU196–1, which provides:

> The following replaces Part III, Uninsured Motorist Insurance—Coverage SS, of your policy:

> . . . .

> **Limits of Liability**

The Uninsured Motorists Insurance for Bodily Injury limit stated on the declarations page is the maximum amount payable for this coverage by this policy for any one accident, except when two or more vehicles are insured under this policy, **we** will stack or aggregate up to two, but no more than two, *uninsured motorist insurance for* **bodily injury** coverages under this policy. This means the insuring of more than one auto for other coverages or under Section II of this coverage will not increase **our** limit of liability beyond the amount shown in the declarations, except when two or more vehicles are insured under this policy, we will stack or aggregate up to two, but no more than two, Uninsured Motorist Insurance for Bodily Injury coverages under this policy. Regardless of the number of insured autos under this coverage, the specific amount shown in the declarations is the maximum that **we** will pay under this coverage[.]

In addition, another policy document, Important Notice X5720, further provides:

**Important Notice**

*We've made some changes to your policy.* With this renewal, we have made some changes to your auto policy. The enclosed New Mexico Amendatory Endorsement(s)[ ] actually changes your policy, and the major changes are summarized in this Important Notice.

Please read your policy, any applicable endorsements, your Policy Declarations, and this notice to fully understand your coverage. If you have any questions, please call your agent.

. . . .

**Changes to "Uninsured Motorists Insurance"**

. . . .

●If you insure two or more vehicles under this policy, you can now "stack" the limits of Uninsured Motorists Insurance for Bodily Injury for two of the vehicles. For example, if you have two or more vehicles, which are each insured under this policy at $100,000 per accident for this coverage, we will pay up to $200,000 (subject to the "per person" limit) for injuries sustained as the result of an

accident with a legally-liable uninsured motorist.

{23} To summarize the policy's uninsured motorist bodily injury pricing structure and stacking provisions, Montano was charged and paid one premium amount for uninsured motorist bodily injury coverage for four vehicles under a policy limiting Allstate's liability to $25,000 per person/$50,000 per accident, constituting the "maximum amount payable"; except, however, the policy expressly permits stacking of bodily injury insurance coverage limits for "two, but no more than two," vehicles. Montano raises no issue regarding his receipt before his accident of the policy, including the declarations pages, form AIU130, Amendatory Endorsement AIU196–1, and Important Notice X5720.

### F. The District Court's Decision

{24} Following written and oral arguments, including discussion of cases from the United States District Court for the District of New Mexico addressing similar circumstances and issues, the district court in the present case during the summary judgment hearing agreed with an unpublished January 2001 decision of United States Magistrate Judge Leslie Smith enforcing a 1990 Allstate Insurance policy that precluded stacking. *See Allstate Ins. Co. v. Indep. Appliance & Refrigeration Serv., Inc.,* No. CIV 00–382 LCS/KBM (D.N.M. Jan. 31, 2001) (unpublished mem. opinion and order). Judge Smith found that Allstate Insurance "took the necessary steps set forth in *Rodriguez* [*v. Windsor Ins. Co.,* 118 N.M. 127, 879 P.2d 759 (1994)], in order to effectuate an anti-stacking policy." Specifically, Judge Smith stated:

> *Rodriguez* states that the insurer must notify the insured that only one premium is being charged, that coverage cannot be stacked, and that insured should bear this in mind for the future. *Rodriguez,* 118 N.M. at 133, 879 P.2d 759. Allstate's "Update" clearly and unambiguously sets forth these elements. An insured cannot interpret a policy update in any other way.

The update referred to was a 1990 "Coverage Update" that Allstate Insurance sent to existing insureds "which effectively notified in-

sureds of [its] single premium policy" and "also stated that stacking was no longer part of the insureds' policies." Judge Smith concluded that the insured was "precluded from stacking his coverage due to sufficient notice that his policy no longer allow[ed] multiple premiums nor stacking." Judge Smith's decision was affirmed by the Tenth Circuit Court of Appeals in *Independent Appliance and Refrigeration*, 278 F.3d at 1107 n. 6.

{25} Further, based on the evidence, including expert testimony and affidavits, the district court determined that Montano was paying 1.85 times the premium for single-vehicle coverage for his multi-vehicle coverage, which was less than double the single-vehicle premium, and, therefore, Montano was not paying premiums for coverage on more than two vehicles. The court then entered judgment in Allstate's favor.

## DISCUSSION

{26} We are now at a stage in which insurers are charging one premium amount for uninsured motorist coverage and are attempting to limit or preclude stacking of that coverage's limits. Are these insurers, as Montano contends, attempting to circumvent New Mexico Supreme Court decisions, or, as Allstate contends, are they attempting to meet the Court's requirement that the insured gets what he or she pays for in an unambiguous policy meeting the reasonable expectations of a hypothetical, reasonable insured? Two basic related requirements exist under our stacking jurisprudence: (1) that the insured get "what the hypothetical reasonable insured would glean [or understand] from the wording of the policy and the kind of insurance at issue," and (2) that the insured get "the benefit of what he or she has paid for." *Rodriguez*, 118 N.M. at 130, 879 P.2d at 762.

{27} Montano contends that the policy is ambiguous, requiring a construction favoring stacking. He further contends that the premium paid for his uninsured motorist bodily injury coverage is for four separate coverages because four vehicles are insured under the policy and, no matter what theory or accounting maneuver is devised to hide it, the premium is nothing more than a lump sum total of four separate charges. Under

Montano's theory, the one premium amount is a sham.

{28} Our Supreme Court has, in no uncertain terms, favored stacking of uninsured motorist coverage limits. *See, e.g., Rodriguez*, 118 N.M. at 127, 879 P.2d at 759 (stating that "[o]ur past cases have evolved a strong judicial policy ... favoring stacking"). The Court requires the stacking of uninsured motorist coverage limits where it is determined the insured has paid for it. *See id.* at 127, 130, 879 P.2d at 759, 762 (stating that the statute requires stacking so that the insured may receive damages "to the extent of the insurance purchased for his or her protection," and reiterating "our policy of favoring the concept of stacking to ensure that the insured will receive the benefit of what he or she has paid for"); *Vigil v. Cal. Cas. Ins. Co.*, 112 N.M. 67, 71, 811 P.2d 565, 569 (1991) (stating that the Court has permitted stacking "on the rationale that separate premiums for separate coverages entitle the insured to the benefit of what he or she has paid for"); *Jimenez*, 107 N.M. at 324–25, 757 P.2d at 794–95 (stating that by permitting stacking where separate premiums are charged, "effect is given to the reasonable expectations of the insured who purchased the multiple coverages").

{29} When a policy is ambiguous, it is to be construed so as to fulfill the reasonable expectations of the insured. *See Rodriguez*, 118 N.M. at 130, 879 P.2d at 762 (addressing ambiguity, including when the number of premiums charged is not clear, stating "the essential factor in determining whether more than one premium has been charged is whether a reasonable insured reading the policy terms would think that she was paying more than one premium for more than one coverage"); *see also Stone*, 116 N.M. at 467, 863 P.2d at 1088 (holding "clear and unambiguous language purporting to preclude stacking is irreconcilable with the apparent grant of such coverage," and that as a result, the policy did not "unambiguously disallow stacking").

{30} The Court has not, however, ruled that coverage limits must always be stacked no matter what the insurance contract pro-

vides or how the premium is structured. *See Rodriguez*, 118 N.M. at 133, 879 P.2d at 765 ("We do not declare that it is impossible for an insurance company to issue uninsured motorist coverage that is immune to stacking."). Nor has the Court chosen to base its stacking policy on concerns of "fundamental principles of justice." *See Shope v. State Farm Ins. Co.*, 1996–NMSC–052, ¶ 7, 122 N.M. 398, 925 P.2d 515. Rather, New Mexico's rule is based on contract interpretation, which the Court has characterized as a "matter[ ] of public policy." *Id.* ¶ 9.

■ {31} *Rodriguez*, in fact, stated that an insurer can limit its stacking liability contractually through "a *truly* unambiguous antistacking clause, provided it plainly notifies the insured that only one premium has been charged for one insurance coverage, . . . that cannot be stacked regardless of the number of vehicles covered . . . , and that the insured should bear this feature in mind when purchasing insurance." *Rodriguez*, 118 N.M. at 133, 879 P.2d at 765. While the *Rodriguez* Court acknowledged that the issue in the foregoing statement was not before them and stated that "[t]here will be time enough to consider the question when it is properly presented, briefed, and argued," 118 N.M. at 133, 879 P.2d at 765, we take it to heart. To the extent the statement is considered dicta, we have been admonished to give such dicta "adequate deference and not disregard it summarily." *State v. Johnson*, 2001–NMSC–001, ¶ 16, 130 N.M. 6, 15 P.3d 1233.

■ {32} The *Rodriguez* Court pointed out that, in *Sanchez v. Herrera*, 109 N.M. 155, 160, 783 P.2d 465, 470 (1989), it "gave effect to an unambiguous clause providing that medical payments coverages could not be stacked." *Rodriguez*, 118 N.M. at 133, 879 P.2d at 765. In *Stone*, the Court considered an anti-stacking clause to be "clear and unambiguous" although it held the clause to be in irreconcilable conflict with a provision purporting to grant stacking. 116 N.M. at 466–67, 863 P.2d at 1087–88. And as far back as *Jimenez*, the Supreme Court stated that exclusionary provisions will be enforced if they "are clear and unambiguous in meaning" and "do not conflict with public policy

stated in express statutory language or by indication of legislative intent." *Jimenez*, 107 N.M. at 324, 757 P.2d at 794. Thus, a clear and unambiguous exclusionary clause will not be enforced if the actual circumstances are that the insured is not getting what he or she is paying for. *Id.* at 324–27, 757 P.2d at 794–97 (determining that the clause prohibiting stacking was clear and unambiguous in meaning, but holding, based on a mixture of public policy and reasonable expectations reasoning, that the clause was unenforceable because the insurer charged two separate premiums).

### A. Allstate's Case

{33} Montano's initiation with Allstate was the 1996 policy that precluded stacking, followed by the 1997 renewal policy that permitted stacking of "up to two, but no more than two, uninsured motorist insurance for bodily injury coverages."

{34} Allstate presented information below about its premium structure. Although we ultimately hold that such information should not be considered in determining the key issue in the case, i.e., the insured's reasonable expectations, we set forth some of the information in the interest of completeness. Allstate showed that, in arriving at its premium structure, as long as stacking is not allowed, loss severity need not be considered in establishing a multi-vehicle policy premium. Relying only on claim-frequency data, Allstate then showed that "[t]he average expected claim frequency for all New Mexico multiple-car policies is only slightly greater than the average claim frequency for New Mexico policies covering exactly two cars, because relatively few New Mexico policies insure more than two cars." Allstate also showed that "the average . . . expected claim frequency for two-car policies is less than twice the average . . . claim frequency for single-car policies." In addition, Allstate showed that, applying the multi-vehicle discount, an insured and, specifically, Montano, was actually paying 1.85 times the single-vehicle policy premium for bodily injury coverage. Having established a premium based on loss frequency by which Montano paid less than twice the premium he would have

paid had he insured only one vehicle, Allstate showed that the Amendatory Endorsement and the Important Notice put Montano on notice that Allstate would "stack or aggregate up to two, but no more than two, uninsured motorist insurance for bodily injury coverages." In the policy, Allstate provided both explanation and example.

{35} Allstate therefore contends it has established the *Rodriguez* criteria for limiting stacking, asserting that Montano received what he paid for. Further, Allstate contends that as a reasonable insured, Montano can have no reasonable expectation from reading the policy of stacking beyond what the policy expressly permits.

### B. Montano's Case

{36} Montano's stacking positions may be condensed into three separate arguments, each seeking a result requiring stacking of coverage limits for more than two vehicles.

### (1) Montano Contends the Policy is Ambiguous and a Reasonable Insured Would Expect Stacking of More than Two Limits

{37} Montano asserts that Allstate's attempt to meet the *Rodriguez* requirements fails because the policy language is ambiguous. If material language is ambiguous, the policy will generally be construed in favor of the insured. *See Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000–NMSC–033, ¶ 26, 129 N.M. 698, 12 P.3d 960. As to stacking, the test is whether a reasonable insured would understand that stacking is not permitted under the policy. *Rodriguez*, 118 N.M. at 130, 879 P.2d at 762. If material clauses are in conflict, the result is usually an interpretation favoring stacking. *See Stone*, 116 N.M. at 466–67, 863 P.2d at 1087–88.

{38} "An insurance policy is ambiguous if it is reasonably and fairly susceptible of different [interpretations]. Determining whether a contract is ambiguous is a question of law for the court. We construe an insurance policy as a whole." *Martinez v. Allstate Ins. Co.*, 1997–NMCA–100, ¶ 8, 124 N.M. 36, 946 P.2d 240 (alteration in original) (internal quotation marks and citations omit-

ted). We will not strain to locate ambiguities. *See Gamboa v. Allstate Ins. Co.*, 104 N.M. 756, 759, 726 P.2d 1386, 1389 (1986).

{39} Thus, we must determine what "a reasonable insured reading the policy terms would think that [he or] she was paying [for]." *Rodriguez*, 118 N.M. at 130, 879 P.2d at 762. That focus, in this case, is on Allstate's single-vehicle policy, multi-vehicle policy, and two-tiered premium structure. It is also on a multi-vehicle policy initially precluding any stacking, but amended to allow stacking of two, but no more than two, limits, and charging one premium amount for uninsured motorist bodily injury coverage.

{40} Montano's ambiguity attack has several facets. First, Montano asserts that Allstate uses the term "stacking" without a "coherent definition or explanation." He argues that because "[n]ot many people who purchase automobile insurance comprehend esoteric legal and insurance concepts such as 'stacking,' " the policy's provisions cannot be construed to limit stacking. *Id.*

{41} The Amendatory Endorsement states that Allstate "will stack or aggregate." Montano nowhere explains how an insured is unable to understand the meaning of these words, particularly in view of the example given in the Important Notice as to how the stacking works. We see no ambiguity by using the words "stack" or "stacking" in the policy. *Cf. Morro v. Farmers Ins. Group*, 106 N.M. 669, 670, 672, 748 P.2d 512, 513, 515 (1988) (using "aggregate" and "stacking" as synonymous verbs and describing stacked limits as "damages in aggregate").

{42} Second, Montano asserts that it is inherently ambiguous to charge one premium amount for uninsured motorist coverage in a multi-vehicle policy, in that an insured can reasonably assume and believe that the premium is divisible by the number of vehicles insured under the policy, and therefore that stacking is permitted. This argument disregards the clear implication of *Rodriguez* that, absent a policy ambiguity, an insurer can preclude stacking in a multi-vehicle policy by charging one premium amount and giving adequate notice that stacking is precluded. Contrary to Monta-

no's assertion, a premium charge in one amount for uninsured motorist bodily injury coverage in a multi-vehicle policy in which the premium is nowhere shown as tied to any particular vehicle or vehicles does not on its face create an expectation that stacking is allowed. Further, whether there exists an inherent or hidden actuarial analysis supporting the arguable existence of separate premiums or a premium based on stacking losses is not an issue of ambiguity but, rather, an issue of insurer fraud or deceit.

{43} Third, Montano asserts that language in the form policy, the declarations, the Amendatory Endorsement, and the Important Notice is confusing and internally conflicting. *See Stone,* 116 N.M. at 466–67, 863 P.2d at 1087–88 (denying effect to an anti-stacking clause that conflicted with a clause apparently allowing stacking). Montano observes that under the policy Allstate must pay damages to which Montano is legally entitled to recover from an owner of an uninsured vehicle. He argues that this provision includes stacking, and therefore conflicts with the limitation on stacking in the other policy documents. Further, Montano observes that the declarations pages show separate premium charges for uninsured motorist property damage coverage but contain no reference to stacking, and that the Important Notice and the Amendatory Endorsement in discussing stacking do not distinguish between bodily injury and property damage coverages. In addition, Montano asserts that the stacking provisions require cross-checking in order to understand terms making the stacking limitation unenforceable. *See Harhen v. State Farm Mut. Auto. Ins. Co.,* 61 Ill.App.3d 388, 18 Ill.Dec. 542, 377 N.E.2d 1178, 1182 (1978) (noting that "the wording of the exclusionary provision and the necessity of cross-checking to the policy definitions for an explanation of the terms might prove difficult to a person unskilled in these matters").

{44} Bodily injury coverage compensates the insured for damages the insured is legally entitled to recover. That an insured is to be compensated for the damages he or she is legally entitled to recover does not preclude an insurer from limiting its liability

to the stated policy limits. To rule otherwise would produce an absurd result because it would mean an insurer would not be permitted to state limits of liability that conform to law in its contracts. *See Martinez,* 1997–NMCA–100, ¶ 9, 124 N.M. 36, 946 P.2d 240 (stating that under such an interpretation "there would be no limit to the insurer's liability"). Further, reading the policy as a whole, including the Amendatory Endorsement and Important Notice, we think the policy unambiguously sets out one premium amount charged for uninsured motorist bodily injury coverage, and permits Montano to stack two, but no more than two, uninsured motorist bodily injury $25,000/$50,000 limits. *See Romero v. Dairyland Ins. Co.,* 111 N.M. 154, 156, 803 P.2d 243, 245 (1990) (indicating notice of an essential provision may be satisfied by making the provision "a part of the policy by endorsement on the declarations sheet, by attachment . . . to the policy, or by some other means that makes the [provision] a part of the policy so as to clearly and unambiguously call [it] to the attention of the insured"). The fact that Allstate allows this limited stacking, and therefore that Allstate in effect acknowledges a liability for more than one coverage limit for the $114.30 premium, is not, in our opinion, a basis on which to determine policy ambiguity requiring nullification of the stacking limitation.

{45} Fourth, Montano points out that form AIU130 states that "[i]f more than one auto is insured, premiums will be shown for each auto" and argues a reasonable expectation of four separate, stackable uninsured motorist bodily injury coverage limits. We note that the preceding sentence states, "[a] coverage applies only when a premium for it is shown on the declarations page." We see no ambiguity. The policy tells the insured to look to the declarations pages for coverages and to look to see if a premium is charged. Pages two through five of the declarations pages show specific premiums per vehicle for separate coverages, without mention of uninsured motorist bodily injury coverage or coverage limits. Page six shows one premium applicable solely for uninsured motorist bodily injury coverage no matter which vehicle is involved. The format in which Allstate has set the uninsured motorist bodily injury cover-

age and premium out conforms to the notion that the insurance coverage is tied to the insured and not to any particular vehicle or vehicles. Uninsured motorist coverage "follows the insured." *Rodriguez,* 118 N.M. at 132, 879 P.2d at 764 (recognizing that uninsured motorist insurance is not tied to any vehicle listed in the policy, and that for an insured to receive benefits, it is irrelevant that any vehicle, much less any particular one listed vehicle in the policy, is involved in an accident). The premium for the coverage as set out in the declarations is nowhere shown as a premium relating to any vehicle or vehicles. The manner in which the declarations pages set out premiums and coverages does not create a reasonable expectation after reading the general language in form AIU130 that the one premium has purchased four separate bodily injury coverages or limits that can be stacked, particularly in view of the unambiguous stacking limitation provisions in the Amendatory Endorsement and in the Important Notice.

{46} We continue to recognize that it is up to the insurer to assure that its policy is not ambiguous. But we also recognize that no policy will be perfect. Another lawyer, another court, can always find a better way to write and explain policy language, and to amend policy provisions. With such complex documents as standard form insurance policies with their semi-tailored declarations and endorsements, including amendatory endorsements, and with notices required to be sent to insureds from time to time, litigants can almost always point out some ambiguity or better explanatory language. Here, the documents told Montano that he was paying a $114.30 premium for uninsured motorist bodily injury coverage and that he could stack two, but no more than two, $25,000/$50,000 limits. Montano was given an example showing how the stacking would work. We think a reasonable insured would understand all this notwithstanding the various ambiguity arguments Montano has presented.

{47} In sum, we see no ambiguity in or internal inconsistency among the declarations pages, form AIU130, Amendatory Endorsement AIU196–1, and Important Notice X5720, that compels us to construe the policy

to require stacking beyond two coverage limits. The stacking-related clauses meet the "truly unambiguous" test. *See Rodriguez,* 118 N.M. at 133, 879 P.2d at 765; *Jimenez,* 107 N.M. at 324, 757 P.2d at 794 (stating that exclusionary clause was "clear and unambiguous"); *cf. Shope,* 1996–NMSC–052, ¶ 6, 122 N.M. 398, 925 P.2d 515 (stating that the following clause clearly and unambiguously prevents stacking: "[R]egardless of the number of . . . motor vehicles to which this insurance applies . . . the limit of liability for bodily injury . . . applicable to 'each person' is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of one accident"). The Tenth Circuit Court of Appeals came to the same conclusion with regard to very similar, if not substantively identical, provisions. *See Indep. Appliance & Refrigeration,* 278 F.3d at 1105–07.

### (2) Montano Contends He is Not Getting What He Paid For

{48} The concept of "getting what one pays for" stems from what a hypothetical reasonable insured can reasonably expect and is clearly based, in New Mexico case law, on reasonable contractual expectation. Thus, where it is unclear how many premiums have been charged for a particular type of coverage, the analysis "cannot be isolated from inquiring into the insured's reasonable expectations." *Rodriguez,* 118 N.M. at 130–31, 879 P.2d at 762–63 (recognizing that the court enforces the contract and, where necessary, interprets it "to ensure that the insured will receive the benefit of what he or she has paid for and that people concerned about the dangers of uninsured motorists will be compensated to the full extent of the insurance purchased for their protection"). Those expectations necessarily derive from what the policy says, and from what a purchaser might reasonably be expected to inquire about when purchasing insurance such as, for example, explanations about coverages, costs of coverages, differences in costs depending on the number and type of vehicles insured, and differences in costs and coverages if a single-vehicle policy as opposed to a multi-vehicle policy is purchased. The expectations may also come from what a purchaser may rea-

sonably be expected to already know from past experience insuring vehicles such as, for example, from adding on a second vehicle and learning that a premium for uninsured motorist coverage was a certain amount more when insuring two or more vehicles than when insuring one vehicle.

{49} Montano contends that he has not received what he paid for. He wages a three-pronged attack. As we shall see, one of Montano's contentions appears to fit within the concept of contractual expectation. The others reach outside of that arena. First, Montano asserts that the real premium he paid was $140, consisting of $114.30 for uninsured motorist bodily injury coverage plus $25.70 for uninsured motorist property damage coverage. He argues that $140 is 2.265 times the $61.80 single-vehicle policy premium, which, being more than twice that premium, reaches into the third car covered. Further, Montano asserts that the property damage coverage is worthless because it duplicates collision coverage and that the premium for this property damage coverage constitutes double billing. Therefore, Montano argues, the $25.70 in premiums for property damage coverage must be considered an additional premium for bodily injury coverage. This contention states what Montano considers to be a contractual expectation of stacking.

{50} The collision and uninsured motorist property damage coverages in the policy are the following:

**Coverage DD**

**Auto Collision Insurance**

**Allstate** will pay for direct and accidental loss to **your** insured **auto** (including insured loss to an attached trailer) from a collision with another object or by upset of that **auto** or trailer. The deductible amount will not be subtracted from the loss payment in collisions involving **your** insured **auto** and another **auto** insured by **us**.

**Property Damage Caused by Uninsured Motorists**

This section applies to those vehicles which indicate a premium charge for Uninsured Motorists Coverage for Property Damage on the declarations page. **We** will pay damages that an insured person is legally entitled to recover from the owner or operator of an uninsured auto because of **property damage**. The **property damage** must be caused by an accident and arise out of the ownership, maintenance or use of an uninsured auto.

**"Property damage"**-means damage to or destruction of the insured auto. It also includes damage to property owned by an insured person which is contained in the insured auto at the time of the accident and other property **you** own.

{51} We are not persuaded that the property damage premium is worthless when the insured also has collision coverage. The Legislature has required an insurer to provide uninsured motorist coverage "in minimum limits ... for injury to or destruction of property" in addition to "for bodily injury or death." NMSA 1978, § 66–5–301(A) (1983). Therefore, the Legislature does not consider uninsured motorist property damage coverage to be worthless or a duplication of collision coverage. Further, uninsured motorist property damage covers losses not covered by collision insurance, such as damage by an uninsured vehicle to any property owned by the insured, which would include damage to the insured's home. *See Richards v. Mountain States Mut. Cas. Co.*, 104 N.M. 47, 50, 716 P.2d 238, 241 (1986) (construing the word "property" in Section 66–5–301 to include coverage of the insured's house).

{52} In addition, the compensation for damage may be different. Under the policy's collision coverage, the insured's compensation is actual cash value, after a $500 deductible, and limited by "what it would cost to repair or replace the property or part with other of like kind and quality." Under uninsured motorist property damage coverage, after a $250 deductible the insured receives the "damages that an insured person is legally entitled to recover from the owner or operator of an uninsured auto." Uninsured motorist property damage coverage therefore may also provide greater benefits and coverages, such as, for example, loss of use benefits and perhaps even recovery when the damage is due to an intentional tort. Also,

insureds reasonably may not want to pay the premium to obtain collision coverage on an older vehicle or a vehicle in poor condition, but want the less expensive uninsured motorist property damage coverage for that vehicle.

{53} Nor are we persuaded that uninsured motorist bodily injury and property damage coverages cannot be separately offered to an insured. The coverages for bodily injury and property damage are clearly very different. Nowhere in the statute governing uninsured motorist insurance is there a requirement that bodily injury and property damage coverages be offered for one premium amount that pays for both coverages. *See* § 66-5-301(A). Nor is there a requirement in the statute that if an insured wants to reject one coverage, he or she must reject both coverages. We see nothing in the statute, therefore, that would prevent an insured from rejecting uninsured motorist property damage coverage for which a separate premium is charged were the choice made clear and were he or she to choose to do so. In addition, we have been shown no reason that statute or case law should be construed to forbid this separation or why it should be considered against public policy to charge independent premiums for the two different coverages.

{54} Montano also argues that the addition of the worthless premium for property damage coverage creates a windfall to Allstate, as illustrated by comparing the premiums charged before and after November 1989. He charts out pre-November 1989 premiums, which include in one charge both bodily injury and property damage coverages, and post-November 1989, premiums, which are stated separately for separate bodily injury and property damage coverages:

| Vehicle | Premiums | | |
|---|---|---|---|
| 1 | Pre | | = $23.20 |
| | Post | $34.20 + 4.50 | = $38.70 |
| 2 | Pre | $23.20 + 19.20 | = $42.40 |
| | Post | $63.30 + 9.00 | = $72.30 |
| 3 | Pre | $42.40 + 17.00 | = $59.40 |
| | Post | $63.30 + 13.50 | = $76.80 |
| 4 | Pre | $59.40 + 15.00 | = $74.40 |
| | Post | $63.30 + 18.00 | = $81.30 |

Montano contends the windfall evidences Allstate's intent behind its post–1989 pricing, namely, to generate more revenue while paying out less in claims, with the result of fleecing New Mexico insureds.

{55} Referring to Montano's chart as "concocted solely for [Montano's] brief," Allstate argues that even if it were true that Allstate generated increased revenue when it began in 1989 to charge one premium amount (a proposition, Allstate asserts, for which Montano has produced no evidence), Montano ignores important facts. Allstate contends Montano ignores general increases in costs and the approval by the insurance superintendent of its rate increases. Further, Allstate asserts that, since the 1988–1989 change, it "charges *lower* average [uninsured motorist] premiums in New Mexico than it otherwise would have had to charge to account for its loss exposure" if stacking were allowed.

{56} In the posture in which this case presents itself on appeal, the facts on which Montano bases his "fleecing New Mexico insureds" argument are not undisputed facts relied on by the district court for its decision or undisputed facts we may consider. We, therefore, are unable to pay the argument any heed.

{57} In sum, as to Montano's first contention, Montano has failed to show that the uninsured motorist property damage premium is essentially or merely an additional premium for uninsured motorist bodily injury coverage. We do not consider the two coverages and the different premiums charged to constitute one coverage and one premium amount thereby requiring stacking of all bodily injury coverage limits. Therefore, Montano has not shown an entitlement based on a reasonable expectation of stacking or that he paid for a benefit he did not receive.

■ {58} Second, Montano contends that he is not getting what he paid for because Allstate considered loss severity in establishing its premiums. This contention lies outside the realm of contractual expectation, since it is unlikely a hypothetical purchaser will delve into an insurer's actuarial analysis

and that the insurer will discuss the details of such analysis with the purchaser. Montano relied below on his own actuarial expert's affidavit statements contending that, as a matter of actuarial principles and the expert's interpretation of Allstate documents, Allstate must have considered, and did in fact consider, loss severity, including stacking losses, in calculating the multi-vehicle policy premium. Montano continues this position on appeal. By considering loss severity and, in particular, when including stacking losses, Montano argues that Allstate is charging a far higher premium than it should if it denies stacking losses beyond two vehicles. Montano asserts "[i]t is actuarially unjustified to allow Allstate to charge for a risk, which it does not intend to pay."

■ {59} We will not consider this contention. As indicated in our discussion of the posture of this case on appeal, Montano is precluded from arguing disputed issues of fact as though the district court resolved them in his favor. Montano is therefore bound by the fact that Allstate did not consider loss severity, including stacking losses, in setting the uninsured motorist premiums for bodily injury coverage, but rather considered only loss frequency. His argument therefore fails for lack of factual basis. Furthermore, we are unpersuaded that inquiry into Allstate's actuarial analyses properly fits within the *Jimenez* and *Rodriguez* analytical moorings on contractual expectations. Reaching into Allstate's actuarial analyses requires an investigation quite apart from contractual expectations based on what the policy says and what the reasonable hypothetical insured would be expected to ask or to know from experience with the insurer's insurance policies.

{60} Third, Montano argues that he is not getting what he paid for because the averaging of all New Mexico vehicles requires stacking. Allstate's premiums are based, in part, on an averaging of all vehicles insured by Allstate in New Mexico. Allstate divides the total number of vehicles by the total number of policies, and the result is an average of 2.47 vehicles per policy. From this, Montano asserts that all insureds are paying for 2.47 vehicles based on this averaging.

Montano contends seventy percent of insureds insure only two vehicles but pay based on an average of 2.47 vehicles per policy. He also asserts that averaging the vehicles is the equivalent of averaging the risks associated with each vehicle and further that Allstate's actuarial materials show that, in assessing the risk, Allstate considered loss severity and stacking.

{61} Further, Montano argues that one premium amount can hardly be considered gratuitous as to the third and fourth vehicle coverages, because "[i]t is naive to believe that an insurance company gratuitously provides uninsured motorist coverage free of cost to anyone." *Woodfield v. Bowman,* 1996 WL 736953 at *5 (E.D.La. Dec.26, 1996) (order and reasons) ("All losses, including those related to stacking, were considered in the formulation of [the insurer's] rates. Although [the insurer] wishes to couch the terms of its premiums as one premium for vehicle one and a separate [premium] for two or more, the fact remains that *all* uninsured motorists losses statewide, including those paid because of stacking, were included in determining what that rate was."). In addition, Montano posits that, in permitting no more than four vehicles on a policy, Allstate must have determined that "its 'multi-car' rate [was] based upon the risks associated with no more than four cars." *See id.* at *5–6 (applying Mississippi law, the United States District Court found it significant that after four vehicles were insured on one policy, a new policy with an additional premium was required to insure a fifth vehicle, thereby indicating the insurer was compensated for the first four vehicles by the single premium charged to insure them but was not compensated by that same premium for the fifth vehicle).

{62} In addition, Montano argues that the "statewide averaging of cars per policy to determine a lump sum premium that would generate the same revenue as premiums specifically allocated for each covered car—makes apparent that Allstate priced its current [uninsured motorist] rates on more than [two] vehicles." To say this another way, Montano states that "[e]ach insured vehicle was ... necessarily factored into the aver-

aged premiums [the insureds] were being charged and Allstate continued to be paid a premium based on every vehicle it insured."

{63} We are not persuaded by Montano's arguments relating to the averaging of insured vehicles. These arguments, too, take us outside the confines of contractual expectation, and into the realm of whether an insurer's actuarial determinations are manipulated to arrive at a premium that on its face appears to meet the *Rodriguez* test but, underneath, is a sham that really represents a lump sum of separate charges based on each separate vehicle insured in a policy. Further, underlying these arguments are Montano's speculations regarding Allstate's actuarial analyses. The fact that vehicle averaging is part of an actuarial analysis is not a circumstance that necessarily leads to a conclusion that separate premiums are being charged.

{64} Montano is in essence arguing that Allstate is being dishonest because, as a matter of economics, Allstate is charging an amount that assures its overall exposure risk based on all insured vehicles in New Mexico is adequately covered, and that each of those vehicles is necessarily factored in in determining the exposure risk, and, therefore, that a part of any ostensibly single premium must be allocated to each vehicle. It appears that for Montano to seriously pursue this argument, he would have to present for determination by the trier of fact an expert's detailed explanation of Allstate's actuarial analyses tending to prove his point. Of course, Allstate would likely present conflicting evidence.

{65} Such evidence was not sufficiently presented below. To the extent Montano presented any such evidence, he stipulated it out of play. Even were sufficient evidence presented below and reviewable, it is questionable whether the trier of fact or this Court should be required to study and second-guess insurers' actuarial analyses in every case similar to the case at hand that makes its way into court. Something seems out of joint if the courts are the branch of government through which every insurer's actuarial analyses are to be studied to assure that each insurer is not somehow deceiving

the insured through its complex actuarial process.

{66} Whether a particular insurer's actuarial underpinning and the resulting insurance offering and pricing of coverages is unfair or deceptive would be better addressed in administrative or legislative processes. *See* §§ 59A–16C–1 to–16 (1998, as amended through 1999) (requiring the superintendent of insurance to investigate insurance fraud); §§ 59A–17–1 to–36 (1984, as amended through 1999) (regulating insurance rates and protecting insureds and the public against adverse effects of excessive, inadequate, or unfairly discriminatory rates). To the extent actuarial analyses and resulting premium structures are nothing more than deceptive analytic and accounting devices to rob an insured of the benefit of what he or she is paying for, surely the insurance superintendent is authorized to review such matters when reviewing insurance policies and premium charges filed with the superintendent. *See* NMSA 1978, §§ 59A–18–12(A), (C) (2002), –14 (1987) (requiring insurance contracts to be filed with and reviewed by insurance superintendent; allowing an insured to request his or her insurer "to review the manner in which its filing has been applied as to insurance afforded him," and providing a procedure to address an insured's complaint of a violation of the Insurance Code).

{67} We do not accept Montano's *Woodfield* arguments as persuasive, or *Woodfield* as authority we should follow. *Woodfield* is distinguishable on two important facts. First, the insured proved that the premium in *Woodfield* was based on expected losses, including stacking losses. *Id.* 1996 WL 736953, at *5. Second, the insured's fifth car in *Woodfield* required a new and separate premium, which caused the court to conclude that the insurer would "not blanket its coverage beyond the point of four vehicles," because there "is no compensation to [the insurer] for the risk, based upon the premium charged, past the fourth vehicle so [the insurer] declines to issue further coverage for that price." *Id.* at *5–6. Here, however, the evidence before us is that loss severity, including stacking losses, was not a factor, and

that the multi-vehicle premium was the $114.30 amount no matter how many cars were insured. Even were the courts to consider actuarial analyses on this issue, we are unwilling on the evidence presented to hold that Allstate's actuarial analyses, based on vehicle averaging and "on the increase in loss frequency caused by the fact that more than one vehicle is in use in a multi-car household," actually produced one premium amount covering stacking losses or other measure of loss severity.

### (3) Montano Contends Allstate's Policy Fails to Comply with the Uninsured Motorist Statute

{68} Montano asserts that stacking of coverage limits cannot be restricted except pursuant to the conditions imposed under Section 66-5-301 and regulations adopted by the Department of Insurance. He argues that the contractual limitation on stacking amounts to a rejection of uninsured motorist coverage, and that the limitation is invalid because Montano did not specifically reject the coverage in writing and because the rejection was neither specifically signed by Montano nor physically made a part of the policy. *See generally* 13.12.3 NMAC (2002); *Romero,* 111 N.M. at 156–57, 803 P.2d at 245–46.

{69} The uninsured motorist statutes and regulations promulgated under the statutes do not expressly require an insurer to obtain a specific written rejection that acknowledges a limitation on stacking. The statutes and regulations require written rejection of uninsured motorist coverage. In our view, any requirement of specific written rejection of a stacking limitation must come from the Legislature. We do not interpret our current statutes and regulations to require it. *Cf. Wilson,* 912 P.2d at 348 (holding in single-premium, multi-vehicle policy case that "Oklahoma law does not require insurers to offer stackable [uninsured motorist] coverage with multiple-vehicle policies"). Furthermore, if an insured, such as Montano, wants a certain level of uninsured motorists coverage not provided by stacking, the insured can purchase higher limits. *See* § 66–5–301(A).

### C. The United States District Court (New Mexico) Decisions

{70} We have noted that the Tenth Circuit Court of Appeals recently affirmed an unpublished United States District Court decision rendered by Magistrate Judge Smith. *See Indep. Appliance & Refrigeration,* 278 F.3d at 1107 n. 6. Allstate relies on *Independent Appliance and Refrigeration* and the decision it affirmed. Montano on the other hand relies on three unpublished United States District Court, District of New Mexico, decisions, *Hooten v. Progressive Casualty Ins. Co.,* No. CIV 00–984 KBM/LCS (D.N.M. Apr. 1, 2001) (unpublished mem. opinion and order), *Martinez v. Allstate Ins. Co.,* No. CIV 96–1031 MV/JHG (D.N.M. June 10, 1999) (unpublished mem. opinion and order), and *Ashe v. First Nat'l Ins. Co.,* No. CIV 94–405 SC/DJS (D.N.M. May 12, 1995) (unpublished mem. opinion and order).

{71} *Independent Appliance and Refrigeration* is instructive on the enforceability of Allstate's anti-stacking clause. Other than that, we believe none of these federal decisions are helpful to our decision today. Neither the district court nor the Court of Appeals in *Independent Appliance and Refrigeration* provides useful guidance on other issues. Apart from *Martinez,* which was vacated in an order stating that it would have "[no] further force or effect whatsoever," the language in the policies at issue in those cases was not as clear as the language in this case, which explained the concept of stacking and explained what stacking would be allowed and what would not be allowed. We do not believe that any of Montano's federal cases are persuasive on this issue in this case.

### D. Montano's Solution: Stacking Must Always be Required

{72} Montano's contention that one premium amount charged is necessarily a lump sum of amounts attributable to four separate vehicle and bodily injury coverages reduces to an argument that no insurer can offer multi-vehicle coverage without being required to stack the coverage limits relating to each vehicle insured. Foreseeing that his various specific attacks may not prevail, and

recognizing that he may be asking too much of the district court and this Court to have to examine, evaluate, and form a judgment as to an appropriate profit margin for each insurer or to second-guess each underwriter's cost/profit analyses in each case that comes before us, Montano offers what he considers "the solution."

{73} That solution, according to Montano, is to follow *United States Fidelity and Guaranty Co. v. Ferguson*, 698 So.2d 77 (Miss. 1997), in which the Supreme Court of Mississippi determined, as a matter of "a new public policy," that "[b]ased upon the sound economic benefits of allowing stacking and the lack of bargaining power of the insured," stacking as to all vehicles covered would be required no matter what the language of the policy or the amount or number of premiums charged. *Id.* at 82.

{74} Anticipating that this Court might have concern about disregarding *Rodriguez* in order to follow *Ferguson*'s lead, Montano suggests an analysis that he argues is consistent with *Rodriguez*. The analysis Montano suggests is that *Rodriguez* and other Supreme Court cases have given insurers every opportunity over many years to come up with a bona fide pricing structure constituting neither subterfuge nor charade, and that no insurer, including Allstate, has been able by now to do so. Montano thinks we should decide that the time has come to close Allstate's window of opportunity because Allstate has not produced a pricing structure that either on its face, or through sound, justifiable actuarial analyses, provides to the insured that for which the insured is paying. This detour by Montano does not work. As we have stated in this opinion, it appears from the evidence as it has been presented to us that Allstate's pricing structure and stacking limitation come within *Rodriguez*'s one premium amount and truly unambiguous stacking limitation requirements.

■ {75} Our law and policy have not come to those advanced by Montano and declared in *Ferguson*. *See* 698 So.2d at 82. Clear indications in New Mexico law, particularly from *Rodriguez*, are that if (1) the policy does not read and is not ambiguous in a way that creates a reasonable expectation that stacking is available or otherwise requires us to construe the policy to require stacking, and (2) the policy clearly and unambiguously gives the insured understandable notice that (a) one premium amount pays for specific coverage and limits, and (b) stacking of coverage limits is limited or unavailable, then (3) the insurer is not required to stack coverage limits beyond the limits stated. Our Supreme Court has never indicated that stacking will be required regardless of policy language and regardless of the number or amount of the premiums. Given our Supreme Court decisions, we are in no position to rule, as did the Supreme Court of Mississippi in *Ferguson*, that none of these considerations matter and that if uninsured motorist coverage is purchased, stacking will be required no matter what the policy states and no matter what the pricing structure is or is based on. Therefore, we decline to do so.

{76} Furthermore, based on the policy as written and on how a hypothetical reasonable insured in Montano's position would view the policy, we conclude, under our existing uninsured motorist insurance jurisprudence, that such an insured should expect he or she was purchasing uninsured motorist bodily injury coverage for one premium amount of $114.30 and that if such insured were to call on that coverage he or she should expect the maximum recovery to be twice the $25,000/$50,000 stated limits. Adding to these expectations is the reality that if the insured wants to assure himself or herself greater uninsured motorist bodily injury protection, the insured can pay more and obtain it.

{77} We bring up a final point. If contractual expectations are ruled out, in nevertheless requiring stacking is the court advancing public policy, or defeating it? It would appear likely, if not inevitable, that insurers will simply raise various rates to account for the greater loss severity based on expected stacking losses. Some segments of the public and some consumers may prefer to have stacking available with higher rates; others may not. Perhaps the better policy is that indicated in *Rodriguez*, namely, to allow insurers, subject to the constraints of our case law, to structure premiums and make ade-

quate disclosures as to the limitation or pre-clusion of stacking. Otherwise, the issue seems pretty clearly to be one for the Legislature.

## CONCLUSION

{78} We affirm the district court's summary judgment in favor of Allstate.

{79} **IT IS SO ORDERED.**

I CONCUR: LYNN PICKARD, Judge.

MICHAEL D. BUSTAMANTE, Judge (specially concurring).

BUSTAMANTE, Judge (specially concurring).

{80} I concur fully with the Opinion in its resolution of the ambiguity issue and its handling of Discussion Sections B(3) and C. I also concur in Discussion Section D, with the exception of the last sentence of paragraph 74. I also agree that the result in Discussion Section B(2) of the Opinion should be affirmance of the trial court; but I cannot agree with the majority's analysis.[1]

{81} My disagreement begins with the procedural posture of the case and the standard of review applied. The case was submitted to the trial court on cross motions for summary judgment supported by stipulated facts, affidavits and deposition testimony. As the Opinion makes clear, the affidavits and deposition materials were replete with factual disagreements concerning the actuarial reality of Allstate's premium structure. The factual disagreements involved basic, material issues such as whether Allstate took into account "loss severity" as well as "loss frequency" in setting premiums, and whether the multi-car premium was designed to cover-and thus charged for-expected losses for more than two vehicles.

{82} Given these factual discrepancies, the matter was not proper for true summary judgment. Regardless, the parties apparently agreed to allow the trial court to decide the case on the material submitted without an actual trial. Montano explicitly left it to the trial court to "ascertain and determine the facts" based on the submitted material. In this posture, the trial court understood it was to decide the case on the merits, resolving questions of facts as it saw fit. And the trial court did so, deciding for example, that Montano did not pay uninsured motorist premiums on more than two vehicles. Thus, the trial court did not enter a summary judgment. It made a decision on the merits. As such, it is improper-even impossible-for this Court to apply the summary judgment de novo standard of review, even if the parties urge us to do so. Rather, the normal substantial evidence standard of review should be applied. *Lightsey v. Marshall,* 1999-NMCA-147, ¶ 15, 128 N.M. 353, 992 P.2d 904 ("[W]e review whether there is substantial evidence to support the district court's conclusion, not whether the court could have reached another conclusion.").

{83} Applying the substantial evidence standard of review, I agree with affirmance. The material submitted by Allstate and referenced in the Opinion is not inherently incredible, and, as in any trial, the fact finder could rationally choose to believe it rather than Montano's presentation. This is all the Opinion needs to do.

{84} Instead, in keeping with its decision to apply a de novo standard, the majority launches into a full-blown discussion of the actuarial issue. Apart from being improper and unnecessary, the discussion is unfairly framed, misconstrues *Rodriguez v. Windsor Ins. Co.,* and results in unfortunate and erroneous conclusions about the policy at issue

1. I do not dissent on the merits and urge a decision in favor of Montano because of the serious questions of fact presented by the parties' submissions. These questions of fact preclude a decision as a matter of law in favor of either side, at least as to the time frame specifically at issue. There is not enough in the record to be able to decide as a matter of law whether as of 1997 Allstate was actually charging for a greater risk than it was accepting. As a reviewing court we are properly bound by the trial court's factual decision on the issue. It would be appropriate, however, to conclude—as a matter of law—that Allstate's structure was a subterfuge as of 1989 when it charged a higher premium than the prior year while at the same time precluding stacking entirely. The difficulty is that we do not know how conditions changed in the subsequent eight years.

here and the courts' role in stacking litigation.

{85} First, the issue is unfairly framed in that the Opinion both accepts the factual findings made by the trial court and also refuses to consider Montano's factual arguments because they were not relied on by the trial court. *See* paragraphs 56 and 59 through 64. If the majority truly conducted a de novo review, it would consider Montano's arguments and factual assertions on their full merits without regard to the trial court's decision. Instead, the Opinion simply sweeps away Montano's primary factual arguments: that the premium for property damage coverage should be included in the total uninsured motorist premium; that Allstate's premium includes a value for loss severity; and that the premium includes Allstate's risk for all cars it insures.

{86} The approach is actually a hybrid. The Opinion deals with the facts as if it is conducting a substantial evidence review. But, because the majority believes it is conducting a de novo review, the Opinion uses the truncated facts it does consider to decide the issue as a matter of law.

{87} This approach allows the majority to do more than simply affirm the trial court in this case. In paragraph 74, the majority all but declares-as a matter of law-that Allstate's pricing structure meets *Rodriguez'* requirement that insureds receive what they pay for. The Opinion thus forecloses future challenges to the actuarial basis of Allstate's premium. In this procedural posture, that is simply improper.

{88} Second, I disagree with the Opinion's interpretation and use of *Rodriguez* to limit the role of the courts in assessing whether insureds are "getting what they pay for." Having already brushed away Montano's arguments about Allstate's use of loss severity data as a factual matter, the Opinion in pure dicta proceeds to explain why under *Rodriguez* it is improper for the courts to review the actuarial issue at any rate. In paragraphs 58 and 59 the majority opines that the actuarial inquiry is improper because the "contention lies outside the realm of contractual expectation, since it is unlikely a hypothetical purchaser will delve into an insurer's actuarial analysis."

{89} The majority's interpretation of *Rodriguez* is diametrically opposed to the notion of the "hypothetical reasonable insured" described in the case. The defendant insurance company in *Rodriguez* argued that under our prior case law, "it was the particular expectations of the parties that mattered." 118 N.M. at 130, 879 P.2d at 762 (internal quotation marks omitted). Thus, the defendant in *Rodriguez* attempted to isolate the expectation analysis to the specific insured's understanding, knowledge and experience. Recognizing that few insureds will understand stacking, the Supreme Court rejected this approach making it clear that the correct inquiry was the expectations of the hypothetical reasonable insured; an abstract "Everyperson." *Id.* "Reasonable expectations" are created and measured in large part by public policy preferences stated in our statutes and case law.

{90} Using this approach it is irrelevant whether any insured would care or be able to delve into the actuarial details of Allstate's premium structure. What is relevant is New Mexico's strong policy favoring uninsured motorist coverage and stacking. Our uninsured motorist statute and case law require that insureds get what they paid for. If a premium is calculated taking into account the risks of loss severity *and* frequency associated with stacking in multi-vehicle policies, the insurance company must provide the benefit of that calculation through stacking.

{91} The Opinion concludes in paragraphs 65 and 66 that the courts should leave the actuarial inquiry to the insurance commissioner. Its musing is prompted partly by its mistaken view of *Rodriguez* and partly by unwarranted misgivings about the courts' ability to undertake the analysis. I reject the notion that the courts cannot or should not entertain the issue. Courts regularly delve into matters more grave and more complicated than this. I appreciate that the burden on the plaintiff to prove the case will be heavy. Montano did not merit summary judgment in his favor based on his showing; nor did Allstate. These circumstances are no reason to foreclose the inquiry.

{92} The procedural posture of the case argues for caution and circumspection on our part. Instead, confusing the procedural posture, the majority refuses to consider crucial portions of Montano's case; then chides him for failing to "prove" his case; and, finally, decides the issue as a matter of law. *See* paragraphs 58, 59, 63, 64, 65, and 66.

{93} For these reasons I can only concur in the result of this portion of the Opinion.